**WAISBORD v. UNITED STATES.**

No. 12992.

United States Court of Appeals Fifth Circuit.

May 17, 1950.

Rehearing Denied June 14, 1950.

---

6. Britton v. Hammel, 4 Cal.2d 690, 52 P.2d 221.

Gordon Gibson, Laredo, Tex., Earle S. Zucht, Laredo, Tex., for appellant.

W. G. Winters, Jr., Asst. U. S. Atty., Houston, Tex., Brian S. Odem, U. S. Atty., Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and McCORD and WALLER, Circuit Judges.

WALLER, Circuit Judge.

On the night of November 16, 1948, appellant, a Polish-born, Mexican-naturalized, but illegally-entered alien, with a shopping bag full of ladies' jewelry, and a mind full of determination surreptitiously to swim the Rio Grande River and take the jewelry into Mexico, got off the train at Laredo, Texas. Like other well-laid plans of mice and men, his went awry when the Immigration Border Patrol Officers accosted him and learned of his illegal entry into the United States. As these officers were escorting him out of the crowd at the station, he took flight, with the officers in hot pursuit, and in an effort to save his freedom and his jewelry he cast the latter into the yard of a house as he sped on to hide himself behind a grocery store. But the officers found him and also his treasure and now the Government seeks to forfeit the little hoard of trinkets which he had planned to peddle among the Senoritas south of the border.

It is a complex world. The American merchants crave to sell these doodads— the Senoritas sigh for them. The hot war has long since turned to cold. There is room for thinking that the national security would in no substantial sense be more firmly secured, the national treasury would in nowise have been augmented, while, on the other hand, the United States would have been quickly and cheaply relieved of an illegal alien, had appellant swum the river that night according to plan.

Counsel for appellant have furnished us an excellent and intriguing brief wherein they raise a question not hitherto presented to this, nor passed upon by any other, Court so far as we have learned. They call attention, with admirable fluency and persuasion, to the fact that whatever power there is to forfeit articles about to be exported unpermittedly stems from the Act of June 15, 1917, 22 U.S.C.A. § 401 et seq.,[1] rather than from the Export Control Act of 1940, 50 U.S.C.A.Appendix, § 701. The chief distinctions in the two Acts are that in the 1917 Act it was made illegal to export, or to attempt to export, "any arms or munitions of war, or other articles," in violation of law, whereas in the 1940 Act, and promulgations thereunder, it was made illegal to export "any articles" which the President deemed advisable to withhold from exportation, without a permit. Then, too, the latter Act provided only a fine and imprisonment without the power of forfeiture as was in the 1917 Act.

1. Sec. 401, Title 22 U.S.C.A., is as follows: *"Seizure of war materials intended for unlawful export generally; forfeiture.*

"Whenever an attempt is made to export or ship from or take out of the United States any arms or munitions of war, or other articles, in violation of law, or whenever there shall be known or probable cause to believe that any such arms or munitions of war, or other articles, are being or are intended to be exported, or shipped from or taken out of the United States, in violation of law, the several collectors, comptrollers of customs, surveyors, inspectors of customs, and marshals, and deputy marshals of the United States, and every other person duly authorized for the purpose by the President, may seize and detain any articles or munitions of war about to be exported or shipped from, or taken out of the United States, in violation of law, and the vessels or vehicles containing the same, and retain possession thereof until released or disposed of as directed in sections 402–408 of this title. If upon *due inquiry as provided in such sections the property seized shall appear to have been about to be so unlawfully exported, shipped from, or taken out of the United States, the same shall be forfeited to the United States."

Counsel for appellant say that even if the two Acts are to be read in *pari materia*—whereby to wreak a forfeiture—nevertheless, under the doctrine of *ejusdem generis,* the 1917 Act only authorizes the forfeiture of "arms or munitions of war," and "other articles" of a like character and kind as arms and munitions. They insist that the statute, being penal, must be strictly construed and that the rule of *ejusdem generis* should always be applied in criminal cases or cases involving infliction of punishment or penalties.

Appellant's position that there is no statutory authority for forfeiting the jewelry involved in this case unless authority is found in the 1917 Act, and its amendments, is correct. There is no express authority in the 1940 Act to authorize a forfeiture, and if his postulate is correct that no articles can be forfeited under the 1917 Act except arms or munitions of war and other articles *ejusdem generis,* or if he is correct in his contention that the rule of *ejusdem generis must* be applied in determining what is meant by the term "other articles," then his conclusion that there would be no forfeiture would, of necessity, also be correct and the Government's only recourse in this case would be by fine and imprisonment. But he, recognizing that the doctrine of *ejusdem generis* is neither absolute nor a statute but merely an aid to construction which the Court may, or may not, apply—except as to criminal statutes demanding strict construction—insists that Section 406 clearly demonstrates that it was the intent of Congress, in the passage of the 1917 Act, to prevent the shipment only of arms or munitions of war or other articles that were then deemed to be contraband of war, and that such section also gives aid and comfort to his contention that the doctrine of *ejusdem generis* is mandatorily appropriate to a correct construction of the statute. Section 406, in part, provides that: "Except in those cases in which the exportation of arms and munitions of war or other articles is forbidden by proclamation or otherwise by the President * * * nothing contained in sections 401–408 of this title shall be construed to extend to, or interfere with * * * any other trade which might have been lawfully carried on before June 15, 1917, under the law of nations, or under the treaties or conventions entered into by the United States, or under the laws thereof."

By virtue of this language in Section 406 appellant insists that the purpose of the Act was to stop our war materials from going out of the country except to our allies and then only when licensed; that "Congress was not concerned about little aliens taking a few ladies watches and rings out of the country to peddle elsewhere"; and that such an exportation could lawfully have been carried on before July 15, 1917, since it was in no sense in violation of the law of nations.

Thus, in a manner not unlike that by which a wise old fox leads a young and inexperienced pack of hounds into a briar patch whereby to lose them, counsel for the appellant have led us, or sought to lead us, into the mazes and morasses of international law on a hot scent of the thing called "the law of nations". The writer, intrigued by the prospect of such an adventure, has sniffed at the pronouncements of Gentili[2] and Grotius,[3] as well as the Conference of London, all to the effect that "articles which are not susceptible of use in war may not be declared contraband of war." Under such a concept, the idea that international trade in things that are not contraband of war could, under Section 406, supra, continue to be lawfully carried on under the law of nations in the absence of a more definite statutory indication of a contrary purpose is also divertingly suggested.

We emerge, however, not greatly bewildered by our short reconnaissance into the field of ancient concepts. Even though women's trinkets in the days of Grotius and Gentili might not have been considered a part of the accoutrements of warfare, yet the years are many from Gentili to Hitler and from Grotius to Tojo. Many things are now useful as materials for waging war that even at the date of

---

2. "De Jure Belli".

3. "De Jure Belli et Pacis".

the London Conference in 1908 were then totally without martial consequences. In an all-out war the exportation of anything that might prove to be an article of commerce between the country to which such exports were made and an enemy country, without doubt, could be prohibited, despite the viewpoint expressed by Thomas Jefferson, when he was Secretary of State, toward a complaint by the British Government of the sale by American citizens of arms and munitions to an agent of the French Government, that "Our citizens have always been free to vend and export arms; that is the constant occupation and livelihood of some of them." Wherefore, he deemed that there should be no interference with the right of these individuals to continue. In quoting Mr. Jefferson we do so without, in the slightest, intending to put in a plug for or against individual initiative, but we do pause to observe that the difference between this concept of Jefferson and the proclamation of the President prohibiting the exportation of "any articles" under the 1940 Act is of greater vastness than the span of years between Alberico Gentili and Adolph Hitler.

We shall not decide this case on the law of nations for, in its final analysis, the law of nations since 1915 has come periously near to being merely that which a nation is powerful enough to enforce against its contemporaries. We shall, therefore, return to a consideration of the 1917 Act and the relevancy, materiality, and essentiality of the application of the rule of *ejusdem generis*.

We think the answer is found in an amendment to the 1917 statute. Before the amendment, Section 404 provided, among other things, that "and if, after trial and hearing of the issues involved, the property is condemned, it shall be disposed of by sale, and the proceeds thereof, less the legal costs and charges, paid into the Treasury." The following was added by the amendment: "*Provided*, That the court shall order any arms and munitions of war so condemned delivered to the Department of the Army of the United States." Thus it is that the amendment makes different provisions for the condemnation of arms and munitions of war by requiring the delivery thereof, upon condemnation, to the Department of the Army, meanwhile leaving intact the old provisions of the section for condemnation and sale of such property as was not "arms and munitions of war." This amendment clearly shows that the Congress did not have in mind the forfeiture solely of arms and munitions of war but that it had in mind the condemnation, sale, and conversion into cash of any unexportable property that did not come within the category of arms and munitions. In the light of this amendment to Section 4 of the 1917 Act, we think that Congress had in mind not only arms and munitions of war but also "other articles" as the Act says in plain words.

Moreover, we conclude that even if the rule of *ejusdem generis* were to be applied so as to limit "other articles" to those of like kind as arms and munitions of war, the evolution of those terms under the exigencies of modern warfare might well have elevated the seized articles from their erstwhile category as "baubles for the beautiful" into the category of a military necessity, or of contraband of war, and thus have closed them to exportation without Governmental consent. What fine metals and precious stones are useful in the making of instruments for war is not a matter for us to outline and proclaim. That is the responsibility of the President.

All of this discussion could have been eliminated if the appellant had out-distanced his pursuers and made it across the Rio Grande that night, but it seems that his steps, like those charged with the power to abrogate the prohibitions under the statute, permitting the confiscation of Jacob's little hoard, were all too slow. It would seem that the need for the restrictions against such exportations had long since expired on November 16, 1948. The 1940 Act itself expired by its own hand on February 28, 1949,[4] since when many along the border doubtless have been heard to murmur, "Requiescat in pace."

The judgment of the lower Court is

Affirmed.

4. Title 50 U.S.C.A.Appendix, § 701.